J-S37011-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| HOWARD BISHOP | |
| Appellant | No. 765 EDA 2014 |

Appeal from the Judgment of Sentence January 3, 2011
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000199-2009;
CP-51-CR-0000201-2009

BEFORE:  GANTMAN, P.J., SHOGAN, J., and LAZARUS, J.

MEMORANDUM BY GANTMAN, P.J.:                 **FILED JUNE 25, 2015**

Appellant, Howard Bishop, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial convictions of third-degree murder, aggravated assault, and possessing instruments of crime.[1]  We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.[2]  Therefore, we have no reason to

---

[1] 18 Pa.C.S.A. §§ 2502(c), 2702(a), and 907(a), respectively.

[2] The following errors appear in the facts and procedural history of the trial court's opinion:
(a)  at page 2, paragraph 1, line 8, the trial court, not the Superior Court, reinstated Appellant's direct appeal rights *nunc pro tunc*;
(b)  at page 2, paragraph 2, line 4, Appellant timely filed a Rule 1925(b)
*(Footnote Continued Next Page)*

restate them.

Appellant raises the following issues for our review:

> WHETHER THE TRIAL COURT ERRED BY DECLARING JEFFERY HASTINGS AN UNAVAILABLE WITNESS AS THE COMMONWEALTH'S REPRESENTATION OF DUE DILIGENCE UNDER THE CIRCUMSTANCES OF THIS PARTICULAR CASE WAS INSUFFICIENT?
>
> WHETHER THE TRIAL COURT ERRED BY ALLOWING THE NOTES OF TESTIMONY FOR JEFFERY HASTINGS FROM [APPELLANT'S] PRELIMINARY HEARING BE READ TO THE JURY AS APPELLANT UNDER THE CIRCUMSTANCES OF THIS PARTICULAR CASE WAS DENIED A FULL AND FAIR OPPORTUNITY TO CROSS-EXAMINE THE WITNESS.

(Appellant's Brief at 4).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Steven R. Geroff, we conclude Appellant's issues merit no relief.[3] The trial court opinion comprehensively discusses and properly disposes of the questions presented. (**See** Trial Court Opinion, filed August 28, 2014, at 38, 40-41)

_(Footnote Continued)_ ———————

statement on May 29, 2014 (not a notice of appeal);
(c) at pages 2 and 3, the witness' name is "Jeffery Hastings" (not "Jeffrey Hastings").

[3] In his first issue, Appellant argues the court erred in considering as competent evidence alleged text messages between the prosecutor and Mr. Hastings regarding his unavailability. (Appellant's Brief at 13). Nevertheless, Appellant failed to object to these alleged text messages at trial. Therefore, Appellant's argument is waived. **See Commonwealth v. May**, 584 Pa. 640, 887 A.2d 750 (2005), _cert. denied_, 549 U.S. 832, 127 S.Ct. 58, 166 L.Ed.2d 54 (2006) (reiterating absence of specific and contemporaneous objection at trial waives issue on appeal).

(finding: **(1)** Commonwealth exercised due diligence in trying to secure Mr. Hastings' presence at trial, and Mr. Hastings' failure to appear at trial was beyond Commonwealth's control; detective checked addresses supplied by Mr. Hastings' family, all local hospitals, morgue, shelters, and local and state prisons, but was unable to locate Mr. Hastings; Mr. Hastings was unavailable, and his preliminary hearing testimony was admissible against Appellant; **(2)** during preliminary hearing, Appellant conducted extensive cross-examination of Mr. Hastings that tested his recollection, discovered he was given immunity in exchange for testifying, and highlighted inconsistencies between his testimony and police statement; Appellant had full and fair opportunity to cross-examine Mr. Hastings at preliminary hearing; Mr. Hastings' preliminary hearing testimony was properly admitted as substantive evidence at Appellant's trial and did not offend Appellant's right of confrontation).[4]  The record supports the trial court's decision; therefore, we have no reason to disturb it.  Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

---

[4] In the trial court's opinion at page 38, line 2, "*Id.*" should be "***Hill, supra*** at 588."

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/25/2015

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CP- 51-CR-000199-2009<br>CP- 51-CR-000201-2009 |
| vs. | | |
| HOWARD BISHOP | : | SUPERIOR COURT<br>NO. 765   EDA 2014 |

CP-51-CR-0000199-2009 Comm. v. Bishop, Howard
Opinion



7192597031

**FILED**

AUG 28 2014

OPINION

Criminal Appeals Unit
First Judicial District of PA

GEROFF, J.                                        AUGUST 28, 2014

On October 21, 2010, after a jury trial, the Defendant, Howard Bishop, was convicted of murder of the third degree, aggravated assault by causing bodily injury with a deadly weapon, and possessing an instrument of a crime. (N.T., 10/21/2010, pp. 4-6).

On January 3, 2011, the court sentenced the Defendant to fifteen (15) to thirty (30) years of incarceration for murder of the third degree; a concurrent sentence of two-and-a-half (2 ½) to five (5) years for possessing an instrument of a crime; and a consecutive sentence of one (1) to two (2) years for aggravated assault by causing bodily injury with a deadly weapon. The court also ordered restitution to be paid. (N.T., 01/03/2011, pp. 19-21).

No Notice of Appeal or post-sentence motions were filed on the Defendant's behalf. On September 10, 2012, the Defendant filed a *pro se* PCRA Petition alleging ineffective assistance of counsel for failure to file a timely Notice of Appeal on his behalf. On July 2, 2013, the Court of Common Pleas of Philadelphia County appointed Dennis L. Turner, Esquire, to represent the Defendant *in forma pauperis.* On October 7, 2013, Defendant filed an amended PCRA petition pursuant to 42 Pa.C.S. § 9543, seeking reinstatement of his direct appellate rights *nunc pro tunc* because his trial counsel, James Bruno, failed to file an appeal to Superior Court. On February 26, 2014, the Superior Court of Pennsylvania entered the Order of Court reinstating defendant's appellate rights *nunc pro tunc.*

On March 11, 2014, counsel for the Defendant filed an appeal in this case. On May 8, 2014, this court ordered counsel for the Defendant to file a concise Statement of Matters Complained of on Appeal pursuant to PA. R.A.P. §1925(b). On May 29, 2014, counsel for the Defendant filed a timely notice of Appeal pursuant to PA. R.A.P. §1925(b). However, counsel for the Defendant referenced the wrong CP numbers and, as a result, he had not been able to access all the notes of testimony in this matter.[1] On June 17, 2014, at the direction of this court, counsel for the Defendant resubmitted a Statement of Matters Complained of on Appeal.

In his Statement of Matters Complained of on Appeal, the Defendant challenges the sufficiency and weight of the evidence in support of a guilty verdict on the charges of third-degree murder, aggravated assault, and possessing an instrument of crime. He also alleges that the Court erred by (1) declaring Jeffrey Hastings an unavailable witness; (2) allowing the notes of testimony for Jeffrey Hastings from Defendant's preliminary hearing be read to the jury, and (3) not declaring a mistrial. The Defendant also claims ineffective assistance of counsel for failure to request that the jury be polled.

---

[1] The notes of testimony have been available on the Court Reporting System since April 28, 2014.

2

## THE EVIDENCE

### *The Murder*

On September 6, 2008, at about 5:30 PM, Jermaine Myers was driving his car, a gray 1992 Oldsmobile, in the Gratz and York Streets area in Philadelphia. It was still "broad daytime," but it was raining hard that day. His nephew, Jeffrey Hastings ("Hastings"), who shared a residence with Jermaine Myers and his mother Bernice Myers, asked Jermaine Myers to give him a ride and was a passenger in that same vehicle. (N.T. Volume I, 10/18/2010, pp. 51-52; 56; 64).

Several weeks prior to September 6, Jermaine Myers had a confrontation with the Defendant, who was from the same neighborhood. The altercation was related to the Defendant's putting drugs in manholes on the block. (N.T. Volume I, 10/12/2010, pp. 8, 54; N.T., Volume I, 10/14/2010, p. 8; N.T. Volume I, 10/18/2010, pp. 66-68, 83).

Jermaine Myers and Hastings had to pass the area of Gratz and York where the Defendant was frequently seen. Before they drove off, Jermaine Myers took off his gun, a .45, from his waist and passed it to Hastings. Hastings put the gun on his lap. (N.T. Volume I, 10/18/2010, pp.50; 52; 65; 69-70).

As they were approaching the Gratz and York intersection, the Defendant suddenly appeared and started shooting at them. First, he fired two or three shots at the passenger's side of the car where Hastings was sitting. The Defendant was five to ten feet away from the passenger's side as he was shooting. Defendant then moved around to the driver's side and, standing five to ten feet away from Jermaine Myers, fired six to seven shots in his direction. (N.T. Volume I, 10/18/2010, pp.55-58; 71).

3

At that point, Hastings, who "ducked" when he heard those first shots, lifted his head and shot back at the Defendant. Hastings recognized the Defendant, whom Jermaine Myers had pointed out to him many times before as the person with whom he had had an altercation. After the Defendant heard the gunshot, he started running back in the direction from which he had come; as he was running, he continued shooting. (N.T. Volume I, 10/18/2010, pp.53-56; 59; 73-77; 91-92; 96.)

Jermaine Myers drove the car about 18 feet up the block; he then told Hastings that he was shot. He asked Hastings to drive him to the hospital. Hastings got in the driver's seat and drove the car to Temple University Hospital. As they were going to the emergency department, Jermaine Myers "blanked out" and fell down. An ambulance came, and he was rushed to the emergency room. Wounded to his abdomen, Myers was pronounced dead as a result of his injuries three days later. Hastings was also injured with a graze wound to his leg from one of the shots directed at him. (N.T. Volume I, 10/12/2010, p. 60-61; N.T., Volume I, 10/18/2010, pp. 60-62).

Bernice Myers, the decedent's mother, testified that the decedent lived with her at 2335 North Gratz Street, around the middle of the block of Gratz and York streets. Ms. Myers stated that, approximately three weeks before the decedent was shot, he was threatened by someone "down at the corner of [their] block." She noted that from then on, whenever the decedent was ready to come home, he would first call her at home from his cell phone, and ask her to look out the door and check for him "if there was anybody down there" at that corner of Gratz and York. He would only come home when he was certain that there was a "bunch of people" at that corner. Ms. Myers stated that these call were being made for about three weeks before her son

4

was shot. She noted that the decedent felt "threatened" and was "scared." (N.T., Volume I, 10/12/2010, pp. 54-55; 62-63; 67).

Police Officer Michael Haywood testified that he was assigned to the 25th District and that he was on duty on September 6, 2008. Officer Haywood stated that he, in fact, was at Temple University Hospital for a different case, and was ready to leave when he saw a car, a gray Oldsmobile, pull up at the hospital. A passenger got out of the car and "fell face down." The driver of the car informed Officer Haywood that the passenger was shot. Officer Haywood testified that he and the nurses immediately took the "shooting victim" to the E.R. He then came back to speak with the driver of the car; he told Officer Haywood that the victim was his "family member" and that they were driving down Gratz Street when the victim stated that he was shot. Officer Haywood stated that the driver of the car gave him his ID and provided his address to him. (N.T. Volume I, 10/12/2010, pp. 77-78; 81; 86).

When shown photographs of the Oldsmobile with bullet holes, Officer Haywood identified it as the car he saw on September 6, 2008 and confirmed that the photographs accurately depicted how the car appeared when he first saw it. Officer Haywood stated that he notified the Police Department front desk that a gunshot victim had been brought to Temple and of the location of the incident. After the 22nd District police officers arrived at Temple, Officer Haywood left. *Id.* at 82-83; 92.

Detective Ralph Domenic, assigned to the Special Investigations Unit at Central Detective Division, testified that he was initially assigned as the lead investigator in this case before it was turned over to Homicide.[2] Detective Domenic stated that, upon his arrival at Temple University Hospital on September 6, 2008, he learned that the shooting victim had

---

[2] The Special Investigations Unit deals with nonfatal shootings. At the time of the Unit's involvement in this case, the victim was still alive. (N.T., Volume I, 10/12/2010, p. 117).

5

"massive internal injuries." Thereafter, Detective Domenic ascertained that the vehicle the police officers were guarding was, in fact, the victim's vehicle, and arranged for the car to be taken to the police garage, to recover any ballistic or other evidence associated with the car. Detective Domenic stated that, upon securing a search warrant, he entered the vehicle and recovered evidence from the victim's car. Specifically, he indicated that he recovered a .45-caliber semi-automatic handgun, Motorola cell phones, as well as the vehicle registration in the decedent's name. He stated that he also recovered a nine-millimeter fired cartridge casing, and a few pieces of "copper jacketing" - fragments of the jacketing that surrounds a bullet. He proceeded to turn the firearm over to the Ballistics Unit and the car over to the Crime Scene Unit for analysis. Detective Domenic stated that the nine-millimeter cartridge casing did not match the ammunition found in the chamber of the handgun recovered from the car. (N.T., Volume I, 10/12/2010, pp. 116-123; 127).

Elvira Datts, decedent's girlfriend and the mother of his two children, testified that she had been in a relationship with the decedent for about two years and that the decedent lived with his mother and nephew on Gratz Street. Ms. Datts testified that, prior to September 6, 2008, the decedent told her that he "got into a fight with a young boy on the corner of his block." She stated that the decedent showed that person to her about two weeks before he was shot. Ms. Datts pointed to the Defendant when asked if she could identify that person. (N.T., Volume I, 10/14/2010, pp. 6-8).

Ms. Datts also testified that on September 6, 2008, the decedent was trying to reach her by phone when he was shot and that he left a voicemail for her. Further, Ms. Datts testified that in that recorded message, the decedent was saying, "I've been shot, I've been shot," and "I can't breathe." Ms. Datts also stated that there was also another person's voice in the recording and

6

that that other person was saying, "I need to drive, I need to drive." She confirmed that that she recognized the voice in the recording as belonging to "Jeff"[Hastings], the decedent's nephew. (N.T., Volume I, 10/14/2010, pp. 14-15, 17).

Ms. Datts also stated that after the decedent was shot, Hastings came to her house to give her the news and that he was a little "shaken." She confirmed that she identified the Defendant's photograph on the photo spread shown to her by detectives. (N.T., Volume I, 10/14/2010, pp. 10-12).

She also testified that during the two years she and the decedent were together, she never saw him with a gun. She stated that she was surprised to learn that on September 6, 2008, he was carrying a .45-caliber gun. She stated that she never saw Hastings with a gun either. (N.T., Volume I, 10/14/2010, pp. 16-17).

Police Officer Gary Guaraldo, assigned to the Philadelphia Police Crime Scene Unit, testified as to his involvement in processing the 1992 Oldsmobile after it was taken to the police garage.[3] He also prepared a report of his observations and took 30 photographs of the car. First, Officer Guaraldo conducted a "cursory search around the car." He noticed about two strike marks in the passenger's side of the car and a strike mark on the driver's side door. Officer Guaraldo, who had been with the Crime Scene Unit for about eight years and who processed "hundreds of crime scenes" before this one, concluded that the shots were coming from the passenger's side, "going around the car, shooting, [and] ending up with the last shot in the driver's side door." (N.T., Volume I, 10/14/2010, pp. 19-20, 22, 25-26).

---

[3] Officer Guaraldo was not at the original scene. He was notified by Detective Cahill, who was assigned to the homicide, on September 11, 2008. Officer Guaraldo referred to the shooting of September 6, 2008, as a "delayed homicide." (N.T., Volume I, 10/14/2010, p. 22).

7

The photographs taken by Officer Guaraldo showed that there were about nine shots in the front of the vehicle: most of the strike marks were in the upper part of the hood, "just below the windshield, and in the windshield itself." Officer Guaraldo recovered lead and copper fragments from the windshield lower molding, from the front driver's side door interior and from the interior driver's side of the front windshield; he recovered a lead fragment from the middle of the rain reservoir of the windshield. He submitted these fragments as well as a projectile he subsequently recovered from Gratz and York, to the Philadelphia Police Firearms Identification Unit for analysis. (N.T., Volume I, 10/14/2010, pp. 24, 37-38, 41-42).

Officer Edward Song, assigned to the Philadelphia SWAT Unit, testified that on September 27, 2008, at about 6:35 in the morning, he and the other members of the SWAT Unit were at 2532 North Gratz Street, a two-story home, where they served a warrant for the Homicide Unit. Officer Song stated that as the team proceeded to secure the second floor, they observed the Defendant emerge from the back bedroom. They took the Defendant into custody. After the entire property was secured, the homicide detectives were brought in to conduct their search. (N.T. Volume I, 10/18/2010, at 112-114, 121).

Detective Levi Morton, assigned to the Homicide Unit, testified that after the Defendant was arrested by SWAT on September 27, 2008, he and other police personnel executed a search warrant on the property. Detective Morton stated that they collected a number of items from the property, including clothing, assorted car keys, and various paperwork in the Defendant's name. The clothing collected included "one pair of black Dickies pants; one black Dickies shirt which is indicated as 2XL... then one black Dickies short-sleeve shirt; and one pair of blue Dickies pants." All the items collected were "inside the property at 2532 Gratz Street on the second floor

8

rear bedroom." Detective Morton noted that the dark clothing matched the description of the shooter's clothing. (N.T. Volume I, 10/18/2010, at 122-124, 129).

Detective Morton stated that the various documents he collected from the Defendant's residence, including an American Express bill, PNC bank statements, a MasterCard credit card application, a Ford Motor Company recall notice, and documentation from the Department of Motor Vehicles, were all in the name of Howard Bishop at that same address, 2532 North Gratz Street. The Ford paperwork, from March 2008, had to do with a 1996 Grand Marquis. (N.T. Volume I, 10/18/2010. At 126-127, 129-130).

### *Expert Testimony*

Dr. Gary Collins, an Assistant Medical Examiner with the Philadelphia Medical Examiner's Office, testified as an expert in forensic pathology.[4] Dr. Collins stated that he autopsied the decedent's body and wrote a report on the autopsy. (N.T., Volume I, 10/12/2010, p. 98).

Dr. Collins stated that he started with an external examination of the decedent's body. The external examination involved examining "the exterior of the individual to look for the features that are specific to the individual such as the height, weight, ethnicity, his gender." *Id.* at 100-101.[5] He then proceeded to look for evidence of any therapeutic intervention and made a note "of all of the tubes and lines that were on his body, as well as any surgical incisions that were performed or present on the body" over the course of the decedent's hospital stay. Dr.

---

[4] Dr. Collins stated that over the course of his career, he had had over 300 cases where the autopsied individuals had gunshot wounds. (N.T., Volume I, 10/12/2010, p. 96).

[5] Jermaine Myers was "a 31-year-old African-American man. His height was five-feet, 11 inches, and his weight was approximately 258 pounds." (N.T., 10/12/2010, pp.99-100).

9

Collins also looked at the exterior of the body for evidence of any injury and noted that the decedent sustained a gunshot wound to his abdomen. (N.T., Volume I, 10/12/2010, pp. 99-101).

Dr. Collins then proceeded to do an internal examination. He noted "the effects of at least two or three surgeries to [decedent's] abdomen." Dr. Collins confirmed that the decedent "sustained a gunshot wound to the right side of his abdomen, and [that] the bullet went across his body, injuring his liver and soft tissues of the abdomen." Dr. Collins testified that he recovered the bullet – a nonjacketed, gray metallic bullet - on the left side of the decedent's lower chest. Dr. Collins stated that the bullet "went sort of like... leftward inside, upward, and then it also perforated the diaphragm on the left side." This kind of bullet path "would have caused a lot of internal bleeding because the liver is a very vascular organ, typically has a lot of blood in it."[6] Dr. Collins concluded with a reasonable degree of medical certainty that the decedent died of "complications of a gunshot wound to his abdomen," and that the manner of death was homicide. (N.T., Volume I, 10/12/2010, pp. 102, 104-105, 106, 109).

Officer Mark Williford testified as an expert in the field of ballistics, firearms, and firearms identification. Officer Williford stated that he was assigned to the Firearms Identification Unit in 2007, and that prior thereto, he was a crime scene investigator for 11 years. Officer Williford has previously been qualified as an expert in the field of "ballistics evidence, testing, and the nomenclature of firearms." (N.T., Volume I, 10/14/2010, pp. 53-55, 59-60).

Officer Williford stated that he received evidence and prepared a report in connection with this case. He testified that he received a Colt .45-caliber handgun with a five-inch barrel, which had the serial number 70G09406. Detective Domenic submitted the gun to Officer

---

[6] Dr. Collins also stated that with that injury the victim was going to feel the pain and would be able to function for at least a few minutes, "unless he was unconscious or intoxicated." With more internal bleeding, he would begin losing consciousness and go into shock. (N.T., Volume I, 10/12/2010, p. 107).

Williford in an unloaded state. This handgun had a capacity of seven plus one.[7] (N.T., Volume I, 10/14/2010, pp. 61, 64, 68).[8]

Officer Williford also received "several pieces of ballistic evidence, bullet jackets, bullet jacket fragments, [and] lead cores." In addition, Officer Guaraldo submitted a .45-caliber projectile to him.[9] Officer Williford determined with a reasonable degree of scientific certainty that the projectile was fired from the handgun, "the only firearm submitted on this case." (N.T., Volume I, 10/14/2010, pp. 64-66).

He also received and analyzed an uncoated lead bullet core from the chest wall of Jermaine Myers, submitted by the Medical Examiner's Office.[10] The bullet core was "deformed and gauged," and it had "blood-like tissue and substance attached." (N.T., Volume I, 10/14/2010, pp. 64, 70).

Officer Williford explained that when the evidence comes into the Firearms Identification Unit, investigators look at the base of the actual projectile and attempt to establish its diameter to be able to determine the projectile's caliber. He indicated that the .45-caliber projectile's diameter would have been .451. He stated that where there is no good base, they go by the weight. He confirmed that the weight of the bullet core from the decedent's chest wall was 91.5

---

[7] Seven cartridges could fit in the magazine, and one in the chamber. (N.T., Volume I, 10/14/2010, p. 64).

[8] No cartridges were submitted with this handgun. (N.T., Volume I, 10/14/2010, p. 68).

[9] The .45-caliber projectile was a copper alloy, zero six left, meaning that the lands and grove impressions on the projectile were a six left. (N.T., Volume I, 10/14/2010, pp. 64-65).

[10] Officer Williford explained that the "bullet core is the interior portion [of the bullet jacket]. So when you have a projectile, the actual copper portion, the exterior portion is what we call a jacket, and the interior portion is what we call a core. [I]f we have just a lead fragment where you have no rifling, the rifling being the lands and grooves impressions, then we just call it a lead core. But if it has the characteristics of being a bullet core, flat base, impressed marks on the actual lead core, then we can make a determination without putting it under the microscope, because we don't have the bullet jacket to actually see the striated marks, but you can see the impressed marks left as the projectile went through the barrel. As it left the barrel, what commonly happens is the jacket, if it hits something hard … will come off of the lead core, and there's enough impressed marks left on the projectile to determine what the projectile is." (N.T., Volume I, 10/14/2010, p. 69).

11

grains, "which puts it out of the realm of being a .45."[11] Officer Williford concluded that, based on its base and weight, the bullet core was "not heavy enough to be a .45."[12] Rather, it was in the realm of a .38 or nine-millimeter. He also determined that the marks impressed on the bullet core were a "five right," whereas .45 was a "six left." Officer Williford, therefore, stated with a reasonable degree of scientific certainty that the bullet that had mortally wounded the decedent was not fired from the .45 handgun that he received in evidence. (N.T., Volume I, 10/14/2010, pp. 68, 70-71, 73).

Officer Williford noted that the way "the fired cartridge casing is supposed to leave the firearm is through the ejection port, up and to the right." He also explained that "as the slide comes rearward, the fired cartridge casing is made to go up and to the rear. ... If it's turned, manipulated in any way, that fired cartridge casing could go any direction." He mentioned that other variables pertaining to the ejection pattern of the fired cartridge casing included, *inter alia*, whether or not the vehicle was moving, and the wind conditions. Officer Willford stated with a reasonable degree of scientific certainty that it was possible that with a shooter standing 5 to 10 feet in front of a car and using a semi-automatic nine-millimeter handgun, the casing would be able to land inside the car. (N.T., Volume I, 10/14/2010, pp. 74-78.)

Gamal Emira, a Criminalist employed by the Philadelphia Police Criminalistics Laboratory, testified as an expert in the field of gunshot residue testing.[13] Mr. Emira stated that

---

[11] Officer Williford stated that the weight of a .45-caliber would have been 195, 185, 230 in grains. (N.T., Volume I, 10/14/2010, p.71).

[12] Officer Williford also explained that the bullet core makes the majority of the weight of the actual projectile and that when a projectile passes down a barrel, the bullet jacket takes on the barrel's intricate, individual markings. Once that projectile leaves the barrel, if it hits something and the jacket is taken off the core, although the core still keeps the impressed marks, "it doesn't have the microscopic marks that the jacket has already accepted." (N.T., Volume I, 10/14/2010, p.72-73).

[13] Mr. Emira stated that he had also been qualified as an expert in the fields of biological testing, gunshot residue, hair analysis, and saliva analysis previously in the Court of Common Pleas. ( N.T., Volume I, 10/14/2010, p. 100).

12

he analyzed evidence related to the case.[14] On September 29, 2008, Detective Morton submitted the following four items collected from the Defendant's residence at 2532 North Gratz Street, under Property Receipt # 2816226, to Mr. Emira: item #1 – "one pair of black pants, Dickies label, size 32 by 3"; item #2 – a "black long-sleeve shirt with Dickies label, size 2X tall;" item #3 – a "black short-sleeve shirt with the Dickies label, size large; item #4 – a "pair of blue pants with Dickies label, size 36 by 34." (N.T., Volume I, 10/14/2010, pp. 100; 103).

Mr. Emira explained that "when someone fires a gun, because [the] particles are very fine ... they travel distance, and some of these particles will go back and deposit on the shooter's clothing." Once a person has fired a gun and the residue or the particles unique to gunshot residue place themselves on the shooter's clothing, it is easy to wipe off the particles. He stated, "As soon as you wipe it off, it's gone. If you wash it, it's gone." Mr. Emira noted, however, that if the clothing is kept unwashed, it is possible that gunshot residue would remain on the clothing for quite a while. (N.T., Volume I, 10/14/2010, pp. 109; 112-113).

Mr. Emira testified that he started testing these items in his lab on September 21, 2010. He stated that he collected a stub from each piece of clothing he received from the Homicide Unit.[15] He then put each stub inside an electron microscope and examined it for gunshot residue. Mr. Emira explained that, in accordance with standard practice, the automation analysis, which normally takes one to two days, was followed by a manual analysis performed to confirm the

---

[14] Mr. Emira analyzed evidence on Property Receipt # 9009214 and # 2816226. Property receipt # 9009214 was submitted on February 16, 2009. The items on this property receipt were collected from the decedent's 1992 Oldsmobile Delta and consisted of three swabs: "one from the grip, under and inside, of the Colt MK .45 caliber automatic handgun; and Item B, which is a brown and gray stained swab from the trigger; and Item C is very light gray stained swab from the live cartridges." Mr. Emira stated that these swabs were being saved for DNA. (N.T., Volume I, 10/14/2010, p. 101-102).

[15] Mr. Emira explained that he used a "half-inch aluminum rounded stub like tablet." The stub had a carbon tape on top, which was used to apply to the clothing. Any particle in the clothing was, therefore, transferred from the clothing to the tape. (N.T., Volume I, 10/14/2010, p. 104).

13

presence of the gunshot residue particles - the manual analysis involved going to each particle's location and maximizing that particle "up to 100,000 times." (N.T., Volume I, 10/14/2010, pp. 104, 111-113).[16]

Mr. Emira testified that he concluded with a reasonable degree of scientific certainty that the examination detected the presence of particles with chemical composition unique to gunshot residue on stub 1A (on the front of the pair of pants, Item #1) and on stub 2A, R1 and R2 (on the right sleeve of the long-sleeve shirt and the front of the shirt, Item #2). (N.T., Volume I, 10/14/2010, p.110).

### *Additional Testimony and Stipulations at Trial*

Jennie McQueen, Defendant's mother, testified on his behalf. Ms. McQueen stated that Defendant resided with her at 2532 North Gratz Street, two blocks down from the corner of Gratz and York Streets, and the same street on which the decedent lived. She stated that her son drove a "big green car." (N.T. Volume I, 10/18/2010, pp.139-141).

It was stipulated by the Court that in processing the defendant upon his arrest, it was determined that the Defendant drove a mint green Mercury Grand Marquis. (N.T. Volume I, 10/18/2010, pp. 142-143).

It was also stipulated that on March 22, 2002, Hastings pled guilty to the crime of theft by receiving stolen property. (N.T. Volume I, 10/18/2010, p. 144).

### *Witness Unavailability at Trial*

Witness Hastings did not appear to testify at trial and could not be located despite substantial efforts to secure his presence at trial.

---

[16] Explaining the examination process, Mr. Emira stated that the electron beams of the microscope "will hit these specimens, produce x-ray." A chart would then be generated, and it would show if the following three elements, barium and lead and antimony, are present. If these three elements are combined in one particle, "it's considered to be unique for gunshot residue." (N.T., Volume I, 10/14/2010, pp. 111-112).

14

Detective James Burns testified that he last saw Hastings on October 5 or October 6, 2010 but that he had not seen him or talked to him thereafter.[17] Detective Burns stated that Hastings was due back in court on October 12th but that he never showed up. (N.T. Volume I, 10/18/2010, p.10).

Detective Burns stated that ever since Hastings failed to appear in court, he and other detectives were involved in actively looking for him to procure his presence at trial. He testified that he checked all of the known addresses "available to law enforcement" for Hastings, including the addresses that Hastings, who was on probation at that time, listed with the probation department – all with negative results. Detective Burns also checked the homes of Hastings' relatives but was unable to locate him. Among the relatives Detective Burns talked to was Hastings' grandmother, Ms. Myers, with whom he was known to have lived, and his aunt, Kim Hastings. Detective Burns confirmed that altogether detectives checked five residences in various areas of Philadelphia but that they were unable to locate Hastings.[18] (N.T. Volume I, 10/18/2010, p.12, 16, 20, 23).

Detective Burns also testified that in addition to residences they checked three shelters. He stated that in two of the shelters, Hastings was "recognized," but he had not been in either for a while. They also conducted, with negative results, both state and local custody checks, Philadelphia area hospital checks[19], and morgue checks. (N.T., Volume I, 10/18/2010, p.14-16).

---

[17] Detective Burns testified that on the day he last saw him, Hastings gave him his telephone number and his address. Detective Burns stated that Hastings was "[a]little nervous," but that he did not display any fear. Id. at 11

[18] In addition to checking the address listed on his driver's license (Hastings had not lived at that address for some time), they checked the addresses in the North Philadelphia, West Philadelphia, and Southwest Philadelphia sections of the city.

[19] Specifically, Detective Burns stated that they checked the following hospitals: Albert Einstein; Chestnut Hill, Frankford, Frankford Torresdale, Hahnemann, Hospital of the University of Pennsylvania, Jefferson, Lankenau, Mercy, Methodist, Pennsylvania, Presbyterian, and Temple University hospitals. (N.T. Volume I, 10/18/2010, p. 14).

15

Jeffery Myers, Jeffery Hastings' father, testified regarding his efforts to assist law enforcement with locating his son. He stated that he talked to his son the last time before the case was scheduled for trial and that he even brought clothes for him to the courtroom. (N.T. Volume I, 10/18/2010, pp. 25, 30).

Mr. Myers also stated that he "constantly tried to locate [Hastings] on the cell phone." However, Mr. Myers was unable to reach him or talk to him after Hastings had failed to appear in court. He left numerous voicemails asking his son to return his calls. He never heard from him.[20] Myers also testified that Hastings was a schizophrenic, and that he had a history of staying in mental hospitals. Mr. Myers indicated that it was unusual for him not to hear from his son for this extended period of time and that he was worried about him. (N.T. Volume I, 10/18/2010, pp.2-27, 29, 31-32).

Mr. Myers also stated that he contacted Hastings' grandmother to find out the address of Kim Hastings, his aunt. Hastings sometimes visited her at her place located at the 2400 block of Sergeant Street. He also stated that that was the reason he sent the detectives to Kim Hastings. Mr. Myers also stated that his son seemed "a little agitated" at the prospect of returning to court but that he never told him that he was scared or that he wanted to be moved. (N.T. Volume I, 10/18/2010, pp. 26-28).

At the unavailability hearing, this court was satisfied that the Commonwealth met its burden of due diligence in trying to locate this witness and procure his presence at trial. The Court, therefore, declared this witness unavailable and allowed the notes of testimony from the

---

[20] Mr. Myers stated that he did not text Hastings because he was unaware "about that kind of technology." (N.T. Volume I, 10/18/2010, p. 32).

16

preliminary hearing held on January 7, 2009 (when the Defendant had a full and fair opportunity to cross-examine the witness) read into the evidence. (N.T. Volume I, 10/18/2010, pp. 40-44).

### Preliminary Hearing Testimony: Jeffery Hastings

#### *Preliminary Hearing: Commonwealth's Direct Examination*

Through direct examination at the preliminary hearing, Hastings testified that the decedent was his uncle, that they lived in the same house at 2335 Gratz Street, and that on the day of the shooting, the decedent agreed to give him a ride. Hastings stated that before turning the ignition on, his uncle passed his gun to him. Hastings put it on his lap. Hastings identified the Defendant, who was present in the courtroom. Hastings indicated that he saw him numerous times before around the neighborhood but that they had never talked. (N.T. Volume I, 10/18/2010 at 49-52).

Hastings testified that they did not go too far and that before they got to the corner of the block, the Defendant suddenly appeared and started shooting. He was initially shooting at the passenger's side of the car where Hastings was sitting. Hastings stated that the Defendant was standing about five to ten feet away from the car when he fired two to three shots at the window on the passenger's side. (N.T. Volume I, 10/18/2010, pp. 54-55).

Hastings noted that initially he could not see who was shooting at them as he was trying to dodge the shots and "ducked." However, when he lifted his head back up – to get ready to shoot back, he recognized the Defendant as the shooter. Hastings also stated that he could see the Defendant well as it was still daytime, though it was raining. Asked whether the Defendant was wearing a mask during the incident, Hastings stated that his sweater had a hood which he pulled over the back of his head. (N.T. Volume I, 10/18/2010, pp.55-56).

17

Meanwhile, the Defendant kept shooting - he moved to the driver's side and "directed his attention" to the decedent. Hastings "kept hearing the bullets hit the windshield." Hastings stated that when the Defendant moved around to the driver's side and started shooting, he was about 5 to 10 feet away from the car. Hastings estimated that probably six or seven shots were fired toward his uncle. At first, Hastings could not shoot back at him, but then he fired one shot at him from the .45 he was holding. After the Defendant heard the gunshot, "he started running back towards the way he came from." He continued shooting as he was running. (N.T., Volume I, 10/18/2010, pp. 57-59).

Hastings stated that after the incident, Jermaine Myers drove the car a short distance, got to the corner, and turned down Cumberland Street. He then told Hastings to take him to the hospital. Hastings confirmed that he got into the driver's seat and drove to the hospital where his uncle was rushed to emergency. He stated that his uncle "kept grabbing his stomach" the last time he saw him. Hastings testified that he himself "had got grazed on" his leg from one of the shots directed at him. (N.T., Volume I, 10/18/2010, pp. 60-62).

He stated that he never saw the Defendant after the incident. He also confirmed that later, when they took him to Homicide, he positively identified the Defendant's photograph. (N.T., Volume I, 10/18/2010, pp. 62-63).

### Preliminary Hearing – Defense Cross-Examination

Through cross-examination, Hastings testified that he was in the car with his uncle because he had asked his uncle to drop him off somewhere. He stated that the decedent got in the car, pulled up, and then Hastings got in. He also stated that after he got into the car, the decedent gave him a .45-caliber gun, which he put on his lap. Answering defense counsel's question as to whether there was anything out of the ordinary about that evening which prompted

18

his uncle to take a gun with him, Hastings responded that he did not have that information but that he was aware that the decedent had a "conflict" with the Defendant. He stated that he found out about that altercation several weeks before the shooting. (N.T., Volume I, 10/18/2010, pp. 64-66).

Under questioning, Hastings stated that the decedent had an argument with the Defendant about "people coming and sticking drugs on the corners of the manholes." Hastings also stated that he did not observe that situation personally but that he had heard about it from the decedent. He also stated that the decedent pointed the Defendant out to him "numerous times because [the Defendant] was sitting right there ... on York Street selling his drugs." Responding to the defense question whether his uncle had a "problem with [the Defendant] selling drugs there because that was [his] corner to sell drugs, Hastings answered that his uncle was not selling drugs there but that he had an issue with the Defendant's "putting stuff in the hole [,] and that's why the conflict came in." Asked about whether he was selling drugs for the decedent, Hastings responded in the negative. Hastings stated that the last time he heard about the conflict concerning a "manhole cover" was around August of 2008, before the block party. (N.T., Volume I, 10/18/2010, pp.66-68).

Hastings also stated that when the decedent passed the gun to him, he did not expect to be involved in any type of conflict that night. He also stated that he did not ask the decedent why he gave him the gun in the first place because he was aware of the animosity between the decedent and the Defendant. Hastings stated that after the decedent passed the gun to him, he just put it on his lap. (N.T., Volume I, 10/18/2010, pp 68-69).

In response to the defense questions as to whether the decedent was looking for someone armed with a gun that night, Hastings answered that he did not think so, but that the decedent

19

was looking to protect himself. He also stated that the decedent gave the gun to him because he was driving. Defense counsel wanted to know exactly why the decedent gave the gun to Hastings rather than hold on to it. Hastings responded that he did not know why Defendant did not put the gun on the floor but reasoned that he probably "couldn't shoot and drive if something happened right there." Hastings stated that he did not tell the decedent that he did not want the gun. He also confirmed that he knew that it was against the law for him to carry a gun. (N.T., Volume I, 10/18/2010, pp. 69-70).

Hastings confirmed that, as the car started moving, he saw the Defendant run from York Street and enter Gratz at the corner. He stated that the Defendant was five to ten feet away to the right from where he was. Hastings noted that initially, he did not recognize the Defendant. He confirmed that the person who ran out was wearing a hood over his head. (N.T., Volume I, 10/18/2010, pp. 71-72).

Hastings demonstrated how the hood was worn by the Defendant:

"QUESTION: [J]ust so the record is clear, you're holding the hood to the top of your head?
"ANSWER: Yes.
"QUESTION: And then you're holding both of your hands on either side of your face so that hood is then touching the sides of your face, your cheeks; is that right?
"ANSWER: Yeah, that's what I was saying, it was like this, I could see his face. Once I lifted my head up after the first two shots [,] I could see the face."

(N.T., Volume I, 10/18/2010, pp. 72-73).

He stated that the Defendant was shooting when he suddenly appeared and for that reason he ducked down in the car. Hastings confirmed that, as the shooting was going on, he raised his head in order to be able to shoot back at the Defendant, "to get him off." He noted that he raised his head up for one or two seconds before he ducked back down and that he saw the Defendant's "whole face" as he sat up. He acknowledged that he later fired one shot - when the Defendant

20

started firing at his uncle. He also confirmed that it was still pouring rain. Hastings also stated that after he fired that shot, the Defendant ran back in the direction from which he had come. As he was running, he continued shooting. In a couple of seconds or so, he could no longer be seen. Hastings stated that after the shooter was gone, the decedent drove down Gratz Street. (N.T., Volume I, 10/18/2010, pp. 73-77).

Hastings stated that he was not asked to identify anyone in person but that he was shown a photo array to identify the shooter. He also confirmed that he told the police that at first he thought that the person who fired at him that night was wearing a mask. He conceded that he had been mistaken and that the shooter was, in fact, wearing a hood. Hastings explained that the reason he was certain that the shooter was wearing a hood was that he was able to see his face. (N.T., Volume I, 10/18/2010, pp. 78-79).

Hastings also testified that the night of the shooting, he went to see Elvira, the mother of the decedent's child. He stated that he mentioned to Elvira that the shooter was dressed in black. Further, Hastings confirmed that he identified the Defendant as the shooter during the interview he gave to Homicide on September 18, 2008. Defense counsel then asked Hastings to look at the copy of the interview Hastings gave to the homicide detectives that day. (The copy was signed by Hastings.) (N.T., Volume I, 10/18/2010, pp. 79-82).

Specifically, defense counsel directed Hastings' attention to the relevant part of Page 3, which read as follows:

> "QUESTION: Did you tell anyone about what happened the night of the shooting?
> "ANSWER: The first person I told was Elvira, she's Jermaine's girl. I went to her house and told her. She knew about the confrontation between Jermaine and the young boy. Jermaine called Elvira when we were driving to the hospital, Jermaine told her that he was shot. When I got to her house I told her what happened. She asked me who did it ... but she told me she knew it was a young boy because it was the only one that he was having problems with. **I told her the guy had a mask** and was wearing black. I also told

21

the police that. I could see ... who it was, he was right in front of me, it was the young boy, I was scared.'

(N.T., Volume I, 10/18/2010, p. 83) (emphasis added).

Hastings stated that he gave this statement to police because he was scared and because he initially did not recognize the shooter. Under questioning, Hastings explained that he said to the detective that the shooter was wearing a mask but that before the interview was over, he told him that the shooter was wearing a hood, not a mask. (N.T., Volume I, 10/18/2010, pp. 83-84).

Asked again by the defense attorney about what he told the mother of the decedent's child, Hastings stated that he did not tell her that the shooter was wearing a mask:

> "QUESTION: Did I read your answer accurately?
> "ANSWER: Yeah, that's what it said right there.
> "QUESTION: And that's what you told the detective, right?
> "ANSWER: Yeah, I told them that at first, but before the interview was over I told him that he had on a hood, it wasn't a mask.
> "QUESTION: No. My question was earlier before I showed you the statement, did you tell Elvira that the person who was firing the gun was wearing a mask? And you said no, you didn't tell her that. Did you tell her that or didn't you tell her that?
> "ANSWER: It said right here, that's what it say [*sic*], yeah.
> "QUESTION: No, I'm asking you did you tell --
> "ANSWER: Yeah, maybe.
> "QUESTION: Let me finish. Did you tell Elvira that the person firing the gun was wearing a mask?
> "ANSWER: No, I didn't.
> "QUESTION: You didn't?
> "ANSWER: No.
> "QUESTION: Well, then why did you tell the homicide detectives that you told her he had a mask?
> "ANSWER: Because at the time I was afraid when I was talking to them. But then before the interview was over I told them the truth, that he had on a hood not a mask."

(N.T., Volume I, 10/18/2010, pp. 84-85).

He also stated that he did not tell any other police officer or detective that the shooter was wearing a mask. (N.T., Volume I, 10/18/2010, p. 85).

22

Hastings also denied saying to the detective that the shooter was wearing "something around his neck." He clarified that what he always meant was that the shooter was wearing a hood:

> "QUESTION: Okay. All right. Now, the next question is:
> 'Question: Was the male you identified as shooting at you and Jermaine wearing a mask?
> 'Answer: It wasn't a mask, it was raining out and he had something pulled up around his neck. I'm not sure what it was, but I could see it was the boy that I showed you.'
> Did you tell the homicide detectives that?
> "ANSWER: No, I ain't said it was something around his neck, I told him it was like a hood on his head.
> "QUESTION: Well, did the homicide detectives make this answer up?
> "ANSWER: As far as it not being a hood, yeah, that it was a hood, nothing around his neck.
> "QUESTION: So in other words, that answer to that question is incorrect; that is your testimony?
> "ANSWER: Supposed to be hood, yeah.
> "QUESTION: So that answer did not come from you; is that correct?
> "ANSWER: No, it's supposed to be hood.
> "QUESTION: Listen to my question. The answer that I just read to you in response to that question?
> "ANSWER: Right.
> "QUESTION: Did those words come from you?
> "ANSWER: Did the words of --
> "QUESTION: Listen to your answer and your statement that you signed.
> 'Answer: It wasn't a mask, it was raining out and he had something pulled up around his neck, I'm not sure what it was but I could see it was the boy that I showed you.'
> Were those your words that you gave to the homicide detective?
> "ANSWER: They was [sic] my words besides the thing around his neck, yes.
> "QUESTION: Besides the thing around his neck. So when it says something pulled up around his neck they're not your words?
> "ANSWER: No, it's supposed to be hood.
> "QUESTION: Supposed to be the word hood there?
> "ANSWER: Yeah.

(N.T., Volume I, 10/18/2010, p. 86-88).

When asked if Hastings knew what a hood was, he stated that he did and that, moreover, he himself was wearing a hood in court that day. He also confirmed that he would not refer to a hood as "something being pulled up around the neck," but that he would just call it a "hood."

23

Hastings also noted that he only briefly reviewed his statement before signing it. Specifically, he confirmed that he did not carefully review the part about "something around his neck" before signing the statement. He noted that, had he reviewed the statement carefully, he would have asked the officer to write the word "hood" instead of "something around his neck." (N.T., Volume I, 10/18/2010, p. 88-90).

Hastings stated that he spoke with Elvira that night at her house. She was telling him about the problem the decedent had with the young boy, and Hastings stated that he knew who the young boy was. He indicated that he saw that person numerous times – 10 to 20 times - around the neighborhood. (N.T., Volume I, 10/18/2010, pp. 90-91).

Defense counsel then referred him to the part of the statement Hastings gave on September 18, 2008 when he testified that he saw the Defendant four or five times:

> "QUESTION: Now, take a look at Page 2 of your statement, third question down.
>
> 'Question: The person who Jermaine was having problems with, have you ever seen him before?
> 'Answer: Yeah, four or five times. Jermaine pointed him out to me and the car he drives...
> Did you say that?
> "ANSWER: Yes."

(N.T., Volume I, 10/18/2010, pp. 91-92).

Asked whether it was "four, five times" or "10, 20 times," Hastings stated that he saw the Defendant "frequently" and no less than 10-20 times. He noted that the part of the statement where he referred to seeing the Defendant "four to five times," was incorrect and that the detectives got it wrong. When asked whether he "signed that page knowing that that was wrong... without carefully reviewing it," he stated that he did not have the time to review the papers properly: "I told you when I got the papers[,] it was brief." (N.T., Volume I, 10/18/2010, p. 92).

24

Hastings stated that the last time he saw the Defendant before the evening of the shooting was sometime after the block party, about "four or five days before the incident." He specified that he saw him drive in the neighborhood, on the block where Hastings' grandmother lives. Hastings noted that he saw him twice – one time in the red car and then, about two days later, "coming thorough" in a blue car. Hastings stated that before that, he saw him around the corner, "sitting on the wall" – four to five days before the shooting. He also stated that he saw the Defendant for the first time ever at the beginning of the summer, around June of 2008. (N.T., Volume I, 10/18/2010, pp. 93-95).

Hastings confirmed that at the time of the incident, he was residing in that area, with his grandmother. He also stated that he knew who the Defendant was even before his uncle pointed him out to him as the person with whom he was having a confrontation. Hastings mentioned that he did not know the Defendant's name but that as soon as his uncle described the Defendant's car to him, he instantly knew that his uncle was referring to the Defendant. Hastings explained that the Defendant was "the only one around there with that type of car." Hastings did not see the car the night of the shooting, because according to him, the Defendant was on foot. Hastings said that the shooter was dressed entirely in black. He also stated that the shooter had a black gun and that it was not a revolver. Hastings indicated that the shooter's firearm "had to be an automatic" based on the sound of the shots that he heard and because he was "right in front of [him] shooting it." (N.T., Volume I, 10/18/2010, pp. 95-97)

Hastings stated that on September 18th, they came looking for him from Homicide at his aunt's house in West Philadelphia, where he was then staying. Hastings confirmed that he moved out of his grandmother's home because the incident happened on his grandmother's block. He also testified that he made no attempt to contact the police to alert them of who the shooter was

25

before they came for him in West Philadelphia but that he told the police about the incident when he was at the hospital. He stated that although he told the police about "the shooting and everything of that nature" at that time, he did not identify the Defendant. Hastings also stated that he did not tell the police at Temple that the shooter was wearing a mask. (N.T., Volume I, 10/18/2010, pp. 97-99).

Hastings testified that when the police asked him if he knew who shot at them, he answered that he "[did] not know their names." He stated that he gave the police a description of the Defendant's car. He also explained that the police did not ask him any other questions about the shooter "other than the name." (N.T., Volume I, 10/18/2010, pp. 99-100).

Hastings stated that the police at Temple asked him about the cause of the incident. He explained that he was panicking at that time and that he told the police that he "didn't know what the incident was about." He also testified that he did not give "right then and there" at Temple a physical description of the person who was involved in the shooting. He stated that he described the Defendant's vehicle to the police as "maroon with rims on it," and the Defendant as a "person who [drove] a maroon car with rims on it." (N.T., Volume I, 10/18/2010, pp. 101-102).

Hastings testified that he was not handcuffed when homicide detectives picked him up in West Philadelphia but that once he got into the detective car, they handcuffed him. They took him down to the Homicide division. He stated that they told him that they knew he was involved in the incident. He explained that they did not tell him that they knew that he fired a gun that night but that they told him "they knew what happened." He stated that they knew that a gun was fired from the car and that he was in the car. (N.T., Volume I, 10/18/2010, pp. 103-104).

Hastings testified that he was in the Homicide division for about three hours or so. He confirmed that they showed him photographs of other individuals from the neighborhood before

26

showing the Defendant's photograph to him. He stated that the Defendant's photo was not one of the three or four they showed him and that he did not know who those photos depicted. When later shown the Defendant's photo, he positively identified the Defendant as the shooter. (N.T., Volume I, 10/18/2010, pp. 105-106).

Hastings conceded that after he identified the Defendant, he was not free to leave. He testified that he never was charged with a crime in connection with the incident – not with carrying a weapon without a license or with being a convicted felon in possession of a firearm. He also confirmed that he was aware of the fact that he had been immunized from prosecution in exchange for his testimony and that, therefore, he could not be charged with a crime in connection with firing a gun. He testified that he was given a lawyer by the court. (N.T., Volume I, 10/18/2010, pp. 106-108).

When asked about whether Hastings would have testified if he had not been given immunity, Hastings initially responded in the negative:

"QUESTION: So you would have testified even if you weren't given immunity; is that right?
"ANSWER: I would have testified if I wasn't given immunity?
"QUESTION: Yeah.
"ANSWER: No.

(N.T., Volume I, 10/18/2010, p.109).

Moments later, Hastings stated that, in fact, he would have testified anyway:

"QUESTION: You wouldn't have testified, right?
"ANSWER: I would have testified because it's my uncle. I got to, you know, I mean I have to stand up for what's right as far as him doing this to my family."

(N.T., Volume I, 10/18/2010, pp.109-110).

## SUFFICIENCY OF THE EVIDENCE

27

The Defendant argues that the evidence presented at trial was insufficient to support the guilty verdict on the charges of third-degree murder, aggravated assault, and possessing an instrument of crime. Upon review of the record, this court finds the Defendant's claims meritless.

The standard for reviewing whether the conviction was based on sufficient evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth as verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond reasonable doubt. *Commonwealth v. Lewis*, 2006 PA Super 314, 911 A.2d 558, 563-64 (Pa. Super. Ct. 2006). When reviewing the evidence adduced at trial, the court may not weigh the evidence and substitute its judgment for that of the fact-finder. *Commonwealth v. Derr*, 841 A.2d 558, 560 (Pa. Super. 2004). It is for the fact-finder to determine any doubts regarding the Defendant's guilt. If the facts relied on by the fact-finder are so weak or inconclusive that, as a matter of law, no probability of fact may be drawn from the circumstances, then the conviction in question cannot stand. *Commonwealth v. Kim*, 888 A.2d 847, 851-52 (Pa. Super. 2005), appeal denied, 587 Pa. 721, 899 A.2d 1122 (2006) (quoting *Commonwealth v. Lehman*, 820 A.2d 766, 772 (Pa. Super. 2003) (citations omitted)). To sustain the conviction, the facts and circumstances relied on by the Commonwealth, as was the case at trial, must show that each and every essential element is established beyond reasonable doubt. *See Commonwealth v. Hargrave*, 745 A.2d 20, 22 (Pa. Super. 2000), appeal denied, 563 Pa. 683, 760 A.2d 851 (2000); *Commonwealth v. Gooding*, 818 A.2d 546, 549 (Pa. Super. 2003), appeal denied, 575 Pa. 691, 835 A.2d 709 (2003). While guilt may never rest upon conjecture or surmise, a conviction may stand on circumstantial evidence. *Commonwealth v. Roscioli*, 454 Pa. 59, 62, 309 A.2d 396, 398 (1973) ("Although the Commonwealth does not have to establish guilt

28

to a mathematical certainty, and may in the proper case rely wholly on circumstantial evidence, the conviction must be based on more than mere suspicion or conjecture."); *Commonwealth v. Brewer*, 876 A.2d 1029, 1032 (Pa.Super. 2005) ("[T]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence." (*quoting Commonwealth v. Murphy*, 795 A.2d 1025, 1038-39 (Pa.Super. 2002)).

**Third-Degree Murder**

Third-degree murder is described under the Crimes Code as all other kinds of murder - meaning other than first-degree murder or second-degree murder. 18 Pa.C.S. § 2502(c). The elements of third-degree murder, as developed by case law, involve a killing done with legal malice but without the specific intent to kill required in first-degree murder. *Commonwealth v. Seibert*, 424 Pa. Super. 242, 622 A.2d 361 (Pa. Super. Ct. 1993). *See also Commonwealth v. Pitts*, 486 Pa. 212, 404 A.2d 1305 (1979). Under the Crimes Code, 18 Pa.C.S. § 101 et seq., the offense of third-degree murder incorporates common law malice as an element. 18 Pa.C.S. §§ 2501, 2502(c). Malice may be inferred from the use of a deadly weapon on a vital part of the body. *Commonwealth v. Seibert, supra. citing Commonwealth v. Hinchcliffe*, 479 Pa. 551, 388 A.2d 1068, *cert. denied*, 439 U.S. 989, 99 S.Ct. 588, 58 L.Ed.2d 663 (1978).

In *Commonwealth v. Malone*, 354 Pa. 180, 47 A.2d 445 (1946), the Pennsylvania Supreme Court clarified the concept of malice: when an individual commits an act of gross recklessness for which he must reasonably anticipate that death to another is likely to result, he exhibits that "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty" which proved that there was at that time in

29

him "the state or frame of mind termed malice." *Id.* at 183, 47 A.2d at 447 (*quoting Commonwealth v. Drum*, 58 Pa. 9 (1868)).

Later, in *Commonwealth v. Seibert*, 424 Pa. Super. 242, 622 A.2d 361, 364 (Pa. Super. 1993), the Court examined the existing case law regarding malice, and described malice as follows: malice may be found where the "actor consciously disregard[s] an unjustified and extremely high risk that his actions might cause death or serious bodily harm." *See Commonwealth v. Young*, 494 Pa. 224, 431 A.2d 230 (1981) (stating that malice is one of the essential elements of third-degree murder and is the distinguishing factor between murder and manslaughter); *Commonwealth v. Rife*, 454 Pa. 506, 312 A.2d 406 (1973) (malice imports the absence of justification, excuse or mitigation and intent to cause a particular harm or the wanton and willful doing of an act with knowledge of circumstances indicating awareness of a plain and strong likelihood that harm will result); *see also Commonwealth v. Hare*, 486 Pa. 123, 129, 404 A.2d 388, 391 (1979) (malice may be found where the perpetrator "consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm"); *Commonwealth v. Wanamaker*, 298 Pa. Super. 283, 444 A.2d 1176 (1982) (same).

In *Commonwealth v. Martinez*, 498 Pa. 387, 446 A.2d 899, 901 (Pa. 1982), the Court held that the finder of fact may employ direct and circumstantial evidence to establish that the perpetrator committed the killing with the requisite malice where a deadly weapon is used against a vital part of the victim's body.

Here, the jury was presented with sufficient evidence that the Defendant acted with malice in killing Jermaine Myers. The Defendant, armed with a gun, opened fire on the decedent's car as the decedent was driving with his nephew, thereby demonstrating conscious disregard that his actions may seriously harm or kill. The Defendant's conduct was wicked and

30

reckless as evidenced, *inter alia*, by his firing six to seven shots in the decedent's direction from a distance of only five to ten feet when he would have reasonably anticipated that death or serious bodily harm would occur to Mr. Myers. The photographs of the car post-incident showed that there were about nine shots in the front of the vehicle, with most of the strike marks being in the upper part of the hood; multiple bullet fragments were recovered from the windshield, from the driver's side door interior and from the interior driver's side of the front windshield.

Furthermore, the fact that the Defendant committed the killing with malice is evidenced by his use of a deadly weapon against a vital part of the victim's body. As a result of the shooting, the decedent sustained a gunshot wound to his abdomen. The bullet injured his liver and soft tissues of his abdomen, and he died from his wounds three days later.

The evidence adduced at trial and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, strongly support the Defendant's third-degree murder conviction.

The jury could have found that Defendant's use of a deadly weapon on a vital part of the decedent's body was alone sufficient to establish third-degree murder. Viewing the evidence in its entirety, this court is persuaded that the Commonwealth proved beyond reasonable doubt that the Defendant committed murder of the third degree.

### Aggravated Assault

The Defendant's next argument is that the evidence was insufficient to support the guilty verdict on the charge of the aggravated assault by causing bodily injury with a deadly weapon.

Aggravated Assault is defined by the Crimes Code as follows:

31

§2702. Aggravated assault
(a) Offense defined.—A person is guilty of aggravated assault if he:
(4) Attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon;

18 Pa.C.S. §2702(a)(4).

Bodily injury is defined as impairment of physical condition or substantial pain. 18 PA.C.S. § 2301. The term deadly weapon includes an operable firearm. *Id.* Since the Defendant's intent is subjective, direct evidence of intent is often unavailable; as such, proof of intent to cause bodily injury may be shown by the circumstances surrounding the attack, and the fact-finder is free to conclude that the accused intended the natural and probable consequences of his actions to result from those actions. *Commonwealth v. Rosado*, 454 Pa. Super. 17, 24, 684 A.2d 605, 608 (1996).

A careful review of the record demonstrates that sufficient evidence existed to prove that the Defendant committed an aggravated assault against Hastings. Here, the Defendant used a deadly weapon against Hastings when he ran out and fired two to three shots at the passenger's side of the car where Hastings was sitting. The record demonstrates intent to injure as the Defendant fired the shots at Hastings at a close range of five to ten feet which he could have reasonably anticipated would cause bodily injury to Hastings. In fact, one of the shots that the Defendant directed at Hastings caused a graze wound to his leg.

The evidence presented by the Commonwealth, therefore, proves beyond reasonable doubt that the Defendant used a deadly weapon to cause bodily injury to Hastings and supports the guilty verdict on the aggravated assault charge.

**Possessing an Instrument of a Crime**

32

The Defendant further contends that the evidence was insufficient to support the guilty verdict on the charge of possessing instrument of crime. The Defendant's argument is meritless and must fail.

Under the law, a person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally. 18 Pa.C.S. § 907(a). An instrument of crime includes (1) anything that has been specially made or specially adapted for criminal use; (2) anything the actor used for criminal purposes and had in his possession under circumstances not manifestly appropriate for lawful uses the item may have. *Id.* To convict of this offense, the Commonwealth has to prove that the Defendant "possessed [the] gun under circumstances manifestly inappropriate for such lawful uses the gun may have had and with an intent to employ it criminally." *Commonwealth v. Jeter*, 275 Pa. Super. 89, 94, 418 A.2d 625, 628 (1980).

The evidence supporting defendant's conviction of possessing an instrument of crime can be "based primarily on the victim's testimony." *Commonwealth v. Monroe*, 281 Pa. Super. 328, 333 422 A.2d 193, 195 (1980). *See Jeter*, supra, at 628 (finding the evidence sufficient to sustain the conviction of possessing an instrument of crime where the defendant "entered the victim's bar, drew a loaded gun from her pocket, and fired it twice at the victim without provocation."). The deficiency of lacking "a weapon or other piece of evidence ... can be overcome by sufficient circumstantial proof of guilt." *Commonwealth. v. Young*, 692 A.2d 1112, 1113 (Pa.Super. Ct.1997). *See also Commonwealth. v. Pettus*, 492 Pa. 558, 561, 424 A.2d 1332, 1334 (1981) (evidence sufficient to support "verdict finding defendant guilty of... possession of an instrument of crime, despite defendant's contentions that such evidence was circumstantial in nature and of an unreliable quality due to testimony that each witness had consumed an unspecified quantity of wine").

33

The evidence established that the Defendant possessed the gun used to fire multiple shots at the car in which the decedent and the witness were riding. The Defendant had a motive for harming the victim, as he had engaged in an altercation with him earlier.

Although no weapon was recovered, that deficiency was overcome by ample circumstantial evidence proving the Defendant's guilt. The nine-millimeter fired cartridge casing recovered from the crime scene did not match the ammunition found in the chamber of the decedent's firearm found in the car. The ballistics analysis of an uncoated lead bullet core from the chest wall of the decedent, submitted by the Medical Examiner's Office, allowed the ballistics expert to conclude with a reasonable degree of scientific certainty that the bullet that had mortally wounded the decedent was not fired from the .45 handgun of the decedent and that a different firearm was used. Furthermore, the gunshot residue analysis performed on the Defendant's clothing detected the presence of particles with chemical composition unique to gunshot residue on the front of his pants and on his shirt.

This court is firmly of the belief that, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth as verdict winner, there is sufficient evidence to enable the jury to find every element of possessing an instrument of a crime beyond reasonable doubt.

## WEIGHT OF THE EVIDENCE

Defendant's claim that the verdict was against the weight of the evidence must also fail. The weight given to the evidence is wholly the province of the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Hunzer*, 868 A.2d 498, 506-507 (Pa. Super. 2005). Any motion for a new trial grounded in the contention that the verdict is contrary to the weight of the evidence concedes that

34

there is sufficient evidence to sustain the verdict. *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191-1192 (Pa. Super. 2004), *appeal denied*, 583 Pa. 689, 878 A.2d 864 (2005). Accordingly, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. *Id.* Questions concerning inconsistent testimony go to the credibility of witnesses. *Commonwealth v. DeJesus*, 580 Pa. 303, 311, 860 A.2d 102, 107 (2004). The court cannot substitute its judgment for that of the jury on issues of credibility. *Id.* The decision whether to grant a new trial on this basis rests within the discretion of the trial court. *Commonwealth v. Hunter*, 381 Pa. Super. 606, 617, 554 A.2d 550, 555 (1989). A trial court should award a new trial on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice, thereby making the award of a new trial imperative so that what is right and just may be given another opportunity to prevail. *Commonwealth v. Wall*, 2008 PA Super 151, 953 A.2d 581, 586 (Pa. Super. Ct. 2008); *Commonwealth v. Whitney*, 511 Pa. 232, 239, 512 A.2d 1152, 1155-1156 (1986). "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Commonwealth v. Widmer*, 560 Pa. 308, 320, 744 A.2d 745, 752 (2000).

This court finds that the Commonwealth presented sufficient evidence to uphold the Defendant's convictions. The convictions in the present case were not against the greater weight of the evidence.

In the instant case, the evidence established that the Defendant had committed the killing, and the malice could have been inferred, *inter alia*, from the Defendant's use of a deadly weapon against a vital part of the decedent's body. Hastings identified the Defendant, whom he had seen around the neighborhood multiple times, as the shooter.

35

The evidence also demonstrated that the Defendant was in possession of an instrument of crime and that he intended to employ it criminally, because as the record demonstrated, there was a prior altercation between the Defendant and the decedent, as confirmed by Hastings, the decedent's mother, and his girlfriend. In fact, the decedent had fear of the Defendant, to the point that he would not feel safe to go home without checking in with his mother first.

Although the bullet retrieved from the decedent's chest wall could not be conclusively tied to the Defendant's weapon as the weapon was not produced, the fired cartridge casings showed that two distinct guns were used. Ballistic analysis confirmed that the bullet was not fired from the .45 handgun found in the decedent's car. The jury could have, therefore, inferred that the bullet which struck the decedent came from the Defendant's weapon. Moreover, gunshot residue analysis revealed the presence of gunshot powder on the Defendant's clothing.

The evidence also established that the Defendant committed an aggravated assault against Hastings, as he fired shots at him at a close range of five to ten feet. He, therefore, could have reasonably anticipated that his actions would cause injury to Hastings. Indeed, one of the shots directed at Hastings resulted in a graze wound to his leg.

Upon review of the challenge to the weight of the evidence, this court concludes that the verdict was consistent with the evidence. The jury was free to believe all, part or none of the evidence, and it clearly found the evidence to be credible and reliable.

We conclude, therefore, that the jury verdict did not shock any sense of justice. No relief is due.

## FORMER TESTIMONY OF JEFFERY HASTINGS

36

Two of the Defendant's claims relate to Hastings' testimony at the preliminary hearing on January 7, 2009. First, the Defendant claims that this court erred by declaring Hastings an unavailable witness. Specifically, the Defendant argues that the Commonwealth's representation of meeting its burden of due diligence was insufficient. Second, the Defendant challenges this court's decision to allow the notes of testimony for Hastings from the Defendant's preliminary hearing to be read to the jury. The Defendant argues that as such, he was denied a full and fair opportunity to cross-examine the witness.

## Due Diligence

Defendant claims that the Commonwealth did not meet its burden of proving that it acted with due diligence in securing witness Hastings' presence at trial. This claim is meritless and must fail.

While deciding "whether due diligence has been exercised in trying to secure the presence of a witness, the court should not second-guess the methods used by the Commonwealth." *Commonwealth v. Tann*, 298 Pa. Super. 505,507, 444 A.2d 1297, 1298 (1982) (*citing Commonwealth v. Long*, 288 Pa. Super. 414, 432 A.2d 228 (1981). Even if other methods might have possibly been utilized, as long as the Commonwealth has acted reasonably in light of the circumstances at the time, it has acted with due diligence. *Id.* (*citing Long*, 432 A.2d at 231). The Commonwealth bears the burden of proving its due diligence. *Commonwealth v. Ryan*, 306 Pa.Super.159, 169 452 A.2d 264, 269 (1982).

Due diligence is determined on a case-by-case basis; it is a "fact-specific concept." *Commonwealth v. Hill*, 558 Pa. 238, 244, 736 A.2d 578, 581 (1999) (*citing Commonwealth v. Kubin*, 432 Pa. Super. 144, 147 637 A.2d 1025, 1027 (1994); *Commonwealth v. Lloyd*, 370 Pa. Super. 65, 81, 535 A.2d 1152, 1160 (1988). Central to the concept of due diligence is a showing

37

by the Commonwealth that a reasonable effort has been put forth; "perfect vigilance and punctilious care" are not required. *Id.* (*citing Commonwealth v. Polsky*, 493 Pa. 402, 407, 426 A.2d 610, 613 (1981); *Kubin*, 432 Pa.Super. at 147, 637 A.2d at 1027 (*citing Commonwealth v. DeMarco*, 332 Pa.Super. 315, 323, 481 A.2d 632, 636 (1984)).

Having carefully reviewed the efforts made by the Commonwealth, this court is firmly of the belief that the Commonwealth made reasonable efforts to secure Hastings' presence and that his failure to appear for trial was beyond the Commonwealth's control. Specifically, a detective checked a number of locations, including addresses supplied by the Hastings' family. Altogether, the detective checked five residential addresses, and Hastings could not be located at any of those. All of the local hospitals were also checked, and he was not a patient in any one of them. In addition, the Philadelphia county morgue was checked, and he was not at the morgue. Furthermore, custody checks in local and state prisons were also conducted, and he was not in custody. A number of shelters were also checked, and he was not in any one of them.

This court has, therefore, found that the Commonwealth met its burden of due diligence in trying to locate the witness. We have, therefore, declared Hastings unavailable and ruled that Hastings' preliminary hearing testimony was admissible against the Defendant.

### Full and Fair Opportunity to Cross-Examine the Witness at the Preliminary Hearing

The Defendant argues against this court's decision to allow the notes of testimony for Hastings from the Defendant's preliminary hearing to be read to the jury on the grounds that that decision denied him a full and fair opportunity to cross-examine the witness. Petitioner's claim is without merit.

Pa.R.E. 804 states, in relevant part:

38

(a) Criteria for Being Unavailable. A declarant is considered to be unavailable as a witness if the declarant:

...

(5) is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure:

(A) the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1) or (6); or

(B) the declarant's attendance or testimony, in the case of a hearsay exception under Rule 804(b)(2), (3), or (4).

(b) The Exceptions. The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:

(1) Former Testimony. Testimony that:

(A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

(B) is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Pa.R.E. 804(a)(5)(b)(1).

Our Supreme Court has held that former testimony is admissible against the defendant only if the defendant had a full and fair opportunity to cross-examine the witness at the preliminary hearing. *Commonwealth v. Bazemore*, 531 Pa. 582, 588, 614 A.2d 684, 687 (1992).

Under both the U.S. and Pennsylvania constitutions, a criminal defendant has a right to confront and cross-examine witnesses against him. *Id.* at 685 (*citing Commonwealth v. McGrogan*, 523 Pa. 614, 568 A.2d 924, 927 (1990)). However, the introduction of an unavailable witness' prior recorded testimony from a preliminary hearing is admissible at trial and will not offend the right of confrontation, provided the defendant had counsel and a full opportunity to cross-examine that witness at the hearing. *Commonwealth v. McCrae*, 832 A.2d 1026, 574 Pa. 594, Sup.2003, *certiorari denied* 125 S.Ct. 31, 543 U.S. 822, 160 L.Ed.2d 32. Furthermore,

39

> Where the defendant has had the opportunity to cross-examine a witness at a preliminary hearing, probing into areas such as bias and testing the veracity of the testimony, cross-examination, and thus confrontation, within the meaning of the Sixth Amendment has been accomplished.

*Commonwealth v. Stays*, 70 A.3d 1256, 1265, 2013 PA Super 170 (*quoting Commonwealth v. Wholaver*, 605 Pa. 325, 989 A.2d 883, 904 (2010)).

The use of former testimony is permissible under the confrontation clause because the previous opportunity for cross-examination "afford(s) the trier of fact a satisfactory basis for evaluating the truth of the prior statement." *Commonwealth v. Jackson*, 344 A.2d 842, 845, 463 Pa. 301, 308 (1975) (*citing Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972), *quoting California v. Green*, 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970)). *See also Commonwealth v. McCrae*, 574 Pa. 594, 832 A.2d 1026, 1035 (2003) (stating that alleged prior inconsistencies are classic points affecting evidentiary weight and not admissibility, and that it is for the fact-finder to decide on the weight of testimony).

Here, the Defendant, through an extensive cross-examination, did test the recollection of Hastings and illuminated inconsistencies between his testimony and the statement he gave to the police. Among the inconsistent statements at issue were statements as to whether the Defendant was wearing a hood or a mask or something around his neck when Hastings saw him on September 6, 2008 and how many times Hastings got to see the Defendant before the incident (whether he saw him 4-5 times, or 10-20 times).

Moreover, the cross-examination brought to light, *inter alia*, the fact that Hastings was given immunity in exchange for his testimony, and that he may not have testified otherwise. The cross-examination made it possible for the Defendant to test Hastings' recollection and highlight prior inconsistencies and to give the jury ample information on which to determine the credibility and the weight of his testimony.

40

Upon review of the record, this court has found that Hastings was unavailable within the meaning of Pa.R.E., Rule 804 and that the Defendant, represented by his counsel, had a full and fair opportunity to cross-examine Hastings at the preliminary hearing. As such, his former testimony from the preliminary hearing was properly admitted as substantive evidence at the Defendant's criminal trial and did not offend his right of confrontation.

## WHETHER THIS COURT SHOULD HAVE DECLARED A MISTRIAL

The Defendant contends that the trial court erred by not declaring a mistrial upon being advised that the jury was deadlocked. This argument is meritless and must fail.

The double jeopardy clause of the Fifth Amendment states in relevant part that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb."[21] U.S. Const. amend. V. "In a jury case, jeopardy attaches when the jury is sworn." *Commonwealth v. Carson,* 259 Pa.Super. 183, 190, 393 A.2d 778, 781(1978).

Under the law, if a jury is discharged for failure to reach a verdict, the trial judge may declare a mistrial only for reasons of manifest necessity. Pa.R.Crim.P. Rule 605 (B); *see also Commonwealth v. Murry,* 498 Pa. 504, 447 A.2d 612 (1982); *Commonwealth v. Santiago,* 492 Pa. 297, 424 A.2d 870 (1981); *Commonwealth v. Bartolomucci,* 468 Pa. 338, 362 A.2d 234 (1976).

When the jury is deadlocked, the following factors are to be considered in granting a mistrial: the length of time the jury deliberated; the complexity of the issues involved; the number of times the jury came back for instructions; the demeanor of the witnesses; the attentiveness of the jury and other factors the court finds relevant. *Commonwealth v. Curry,* 325

---

[21] The double jeopardy clause of the Fifth Amendment of the United States Constitution applies through the states through the Fourteenth Amendment. *See Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

41

Pa. Super. 365, 371, 472 A.2d 1162, 1165 (1984) (*citing Commonwealth v. Fredericks*, 235 Pa. Super. 78, 340 A.2d 498 (1975)).

When contemplating declaration of a mistrial, the trial court must be careful not to deprive the defendant of his right to a trial by jury by either discharging the jury prematurely or, on the other hand, by coercing the jury to arrive at a verdict. *Commonwealth v. Hoover*, 314 Pa. Super. 158, 161, 460 A.2d 814, 815 (1983) (*citing Commonwealth v. Baker*, 413 Pa. 105, 196 A.2d 382 (1964)). The determination as to whether a verdict cannot be reached so that manifest necessity for declaration of a mistrial exists depends on the number, complexity, and gravity of the charges, and the volume of evidence presented, and rests largely within the discretion of the trial court. *Commonwealth v. Smith*, 324 Pa. Super. 156, 160-61, 471 A.2d 510, 512 (1984) (*citing Commonwealth v. Kivlin*, 267 Pa. Super. 270, 406 A.2d 799 (1979)).

Courts have long recognized that many variables enter into the trial of criminal cases and that the length of a jury's deliberations is not subject to any predetermined mechanical formulation. Accordingly the length of jury deliberations is left to the sound discretion of the trial judge. *Hoover*, 460 A.2d at 815 (citing *Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *U.S. v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *Commonwealth v. Monte*, 459 Pa. 495, 329 A.2d 836 (1974)). *See, e.g., Commonwealth v. Curry*, 325 Pa. Super. 365, 472 A.2d 1162 (1984) (mistrial on ground of manifest necessity warranted where jury deliberated for nearly three days, were sent back to carry on with deliberations when they reported deadlock the first time, and the following day voiced concern that they were hopelessly deadlocked). *But see Commonwealth v. Haefner*, 399 A.2d 707, 264 Pa.Super.144 (1979) (finding no manifest necessity for jury discharge and mistrial where jury had deliberated about eight hours following five days of trial involving testimony of multiple

42

witnesses, arguments by counsel and detailed instructions by court, and where jury foreman announced for the first time that no verdict could be reached less than an hour after indicating that a verdict would be possible).

In the present case, the jury started deliberating on October 19, 2010, after attending the trial from October 12 through October 18, 2010. After the jury started deliberations, they did not come back for instructions; instead, they asked to see the photographs of the car (with multiple bullet holes) and also requested to hear the part of testimony where Mr. Hastings indentified the Defendant. The jury continued deliberations on October 20, 2010, and in the afternoon they sent a note to this court indicating that they could not reach a unanimous decision and that they felt that they were deadlocked.

Finding no manifest necessity for a mistrial, this court sent the jury back for further deliberations. After seven days of trial involving testimony of numerous witnesses, including, *inter alia*, testimony of three expert witnesses, arguments by counsel and this court's extensive jury instructions, the jury had not devoted sufficient time in its deliberations. This court, therefore, instructed the jury to resume deliberations and specifically reminded the jury as follows:

> Keep in mind that any verdict you reach must be unanimous, you do have the duty on the part of each of you to consult with your fellow jurors, and you should be deliberating with a view toward reaching an agreement if you can do that without violence to your own individual judgment. But each of you must decide the case for yourself. You must do that after an impartial consideration of the evidence with other jurors. You should not hesitate to re-examine your own views, and if you think it's appropriate, to change your opinion if you believe that your original opinion you had was erroneous. But don't feel compelled to surrender your honest belief as to the weight or effect of the evidence solely because of the opinion of fellow jurors or for the mere purpose of returning a verdict.

Trial (Jury), Volume 1, October 20, 2010, p. 5.

43

On October 21, 2010, the jury achieved unanimous verdicts on all of the relevant charges. Based on the totality of the circumstances, this court found that there was no manifest necessity to declare a mistrial after being advised that the jury was deadlocked. The Defendant's argument is, therefore, meritless.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, the Defendant argues that trial counsel was ineffective for failure to request that the jury be polled. There is no merit to this claim, and it must fail.

In determining whether counsel rendered ineffective assistance, the court must use a three-pronged test. First, the court must ascertain whether the issue underlying the claim has arguable merit. This requirement is based upon the principle that counsel will not be found ineffective for failing to pursue a frivolous claim or strategy. Second, if the petitioner's claim does have arguable merit, the court must determine whether the course chosen by counsel had some reasonable basis designed to serve the best interest of the petitioner. Finally, if a review of the record reveals that counsel was ineffective, the court must determine whether the petitioner has demonstrated that counsel's ineffectiveness worked to his prejudice. *Commonwealth v. Breisch*, 719 A.2d 352 (Pa. Super. 1998); *Commonwealth v. Pendola*, 416 Pa. Super. 568, 611 A.2d 761 (1992), *appeal denied*, 629 A.2d 1378 (Pa. 1993). Failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. *Commonwealth v. Hudson*, 820 A.2d 720, 726 (Pa. Super. 2003).

In order to establish prejudice, a petitioner must show that counsel's ineffectiveness was of such magnitude that the verdict essentially would have been different absent the ineffective assistance. *Commonwealth v. Howard*, 538 Pa. 86, 645 A.2d 1300, 1308 (1994). *See also* Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

44

Counsel is never ineffective for failing to make a frivolous objection or motion. *Commonwealth v. Groff*, 356 Pa. Super. 477, 514 A.2d 1382, 1386 (1986), *appeal denied*, 531 A.2d 428 (Pa. 1987); *Commonwealth v. Davis*, 313 Pa. Super. 355, 459 A.2d 1267, 1271 (1983). Similarly, counsel is never ineffective for failing to raise a frivolous issue in post-verdict motions or on appeal. *Commonwealth v. Thuy*, 424 Pa. Super. 482, 623 A.2d 327, 355 (1993); *Commonwealth v. Tanner*, 410 Pa. Super. 398, 600 A.2d 201, 206 (1991).

The law presumes that trial counsel was effective. *Commonwealth v. Quier*, 366 Pa. Super. 275, 531 A.2d 8, 9 (1987); *Commonwealth v. Norris*, 305 Pa. Super. 206, 451 A.2d 494, 496 (1982). Therefore, when a claim of ineffective assistance of counsel is made, it is the petitioner's burden to prove such ineffectiveness; that burden does not shift. *Commonwealth v. Cross*, 535 Pa. 38, 634 A.2d 173, 175 (1993), *cert. denied*, 115 S.Ct. 109, 130 L.Ed.2d 56 (Pa. 1994); *Commonwealth v. Marchesano*, 519 Pa. 1, 544 A.2d 1333, 1335-36 (1988); *Commonwealth v. Tavares*, 382 Pa. Super. 317, 555 A.2d 199, 210 (1989), *appeal denied*, 571 A.2d 382 (Pa. 1989).

A defendant has an undeniable right "to poll the jury which has returned a verdict of guilty against him." *Commonwealth v. Martin*, 379 Pa. 587, 592, 109 A.2d 325, 327 (1954). Polling the jury allows determining "definitely ..., before it is too late, whether the jury's verdict reflects the conscience of each of the jurors or whether it was brought about through the coercion or domination of one of them by some of his fellow jurors or resulted from sheer mental or physical exhaustion of a juror." *Id.*

However, a failure to poll the jury does not signify ineffective assistance of counsel "in the absence of other factors." *Commonwealth v. Williams, 537 Pa.1, 31, 640 A.2d 1251, 1266 (1994)*. In *Williams,* the Court reasoned that because the verdict slip contained the signatures of

45

all twelve jurors and the appellant failed to demonstrate any error or prejudice arising out of the failure to poll the jury, counsel was not ineffective. *Id.*

We find that the counsel in the present case was not ineffective for failure to poll the jury. Here, on October 21, 2010, the jury returned its verdict, with all 12 jurors agreeing on the verdict on each bill of information, as confirmed by the foreperson. Failure to poll the jury does not automatically constitute ineffective assistance of counsel. The Defendant has not demonstrated any error or prejudice in this regard. This argument, therefore, is meritless and must fail.

## CONCLUSION

In summary, this court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and nothing to justify the granting of Defendant's request for relief. For the reasons set forth above, the judgment of the trial court should be affirmed.

BY THE COURT:

STEVEN R. GEROFF, J.

46